# In the United States Court of Federal Claims

**BID PROTEST** FINAL REDACTED VERSION

| | | |
|---|---|---|
| **TETRA TECH, INC.** | ) | |
| | ) | **FILED UNDER SEAL**[1] |
| *Plaintiff,* | ) | |
| | ) | **No. ___________________** |
| v. | ) | |
| | ) | **(Judge ___________________)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Pursuant to 28 U.S.C. § 1491(b) and Appendix C of the Rules of the U.S. Court of Federal Claims ("RCFC"), Plaintiff Tetra Tech, Inc. ("Tetra Tech"), through the undersigned counsel, files this bid protest Complaint against the United States, acting through the U.S. Department of the Army Corps of Engineers, Huntsville Center (the "Army" or the "Agency"). Specifically, this protest challenges the Army's decision to award a contract (the "Contract") to Pond Constructors Inc. ("Pond") pursuant to Solicitation No. W912DY26RA017 (the "Solicitation"). The Solicitation and resulting Contract, which are administered by the U.S. Army Engineering and Support Center, Huntsville ("CEHNC"), are for the Fuels Program to support the Defense Logistics Agency-Energy ("DLA") in support of the U.S. Air Force in the South Atlantic Division

[1] This Complaint contains materials currently covered by the protective order in Tetra Tech's prior protest at the Government Accountability Office ("GAO"). Accordingly, pursuant to the requirements of the GAO protective order, this Complaint is filed under seal and Tetra Tech also files a Motion for a Protective Order and a Motion to File Under Seal concurrently with the filing of this Complaint.

[redacted]

("SAD-AF2"). As explained below, Tetra Tech seeks declaratory relief and injunctive relief because of the Army's errors in its evaluation of Tetra Tech's and Pond's proposals.[2]

## SUMMARY OF THE CASE

1. This post-award protest challenges the Army's decision to award the Contract for the SAD-AF2 Fuels Program services to Pond as arbitrary and capricious. As detailed below, during the course of its evaluation, the Army made several notable procurement errors.

2. First, the Source Selection Authority ("SSA") relied on an arbitrary determination during their tradeoff analysis that Pond's proposal was technically superior to Tetra Tech's proposal, despite Tetra Tech receiving an "Outstanding" rating and Pond only receiving a "Good" rating from the Source Selection Evaluation Board ("SSEB"). The SSA's justification to depart from the SSEB's findings was based on the conclusory and unsupported determinations that the strengths identified for Pond's proposal promote "cost savings" and "efficiency," which primarily benefits the government, while the strengths for Tetra Tech's proposal "increase the chances of successful contract performance," which primarily benefits Tetra Tech. (*See* Ex. D, Source Selection Decision Document at 11.) The SSA's finding that Pond's proposal was technically superior, and reliance on that fact during its tradeoff analysis, is arbitrary and capricious because: (i) the SSA's stated preference for "cost and efficiency" over "increased chances of successful contract performance" is contrary to the terms of the Solicitation; (ii) the SSA's finding applies

[2] The Department of Justice has informed Tetra Tech that the Agency does not intend to voluntarily stay performance of the Contract for the duration of this protest. Accordingly, Tetra Tech also files a Motion for a Temporary Restraining Order and Preliminary Injunctive Relief concurrently with this Complaint.

[redacted]

unstated evaluation criteria; (iii) the SSA failed to consider the weakness assigned by the SSEB to Pond's technical proposal; and (iv) the SSA failed to adequately document and explain its rationale for the decision.

3. In addition to arbitrarily finding that Pond's proposal was technically superior due to the strengths identified for Pond's proposal promoting "cost savings" and "efficiency," the strengths themselves were also arbitrarily assigned to Pond's proposal. First, Pond received a strength because the SSEB erroneously interpreted a statement in Pond's proposal that it has nine (9) offices in the SAD-AF2 region as a statement from Pond committing resources and personnel from all nine (9) offices. Additionally, the SSEB arbitrarily, only assigned a strength to Pond's proposal [redacted]. Finally, the SSEB arbitrarily assigned a strength to Pond's proposal for [redacted], which is contrary to the Solicitation's definition of a "strength."

4. The Army also committed further error when it found Tetra Tech's proposal for Contract Line Item Number ("CLIN") 0004 as unreasonably high because of Tetra Tech's proposed fee for Emergency Services Orders. First, this finding is arbitrary because the total price offered for CLIN 0004 was a firm fixed not-to-exceed amount set by the Agency, meaning that the total price proposed by Tetra Tech for CLIN 0004 was the same as all the other offerors and that Tetra Tech's proposed fee for Emergency Service Orders had no impact on the overall amount for CLIN 0004. Additionally, the conclusion that Tetra Tech's proposed fee for Emergency

[redacted]

Services Orders was unreasonably high is contrary to the requirements of FAR 15.404-1(b)(1), which excludes the consideration of individual cost elements, like the fee for Emergency Services Orders, from a price reasonableness analysis. Further, the SSA's use of the Agency's erroneous determination that Tetra Tech proposed an unreasonably high fee for Emergency Services Orders qualifies as the application of unstated evaluation criteria because the Solicitation did not contemplate the weighing of individual cost elements against non-price factors.

5. Accordingly, Tetra Tech respectfully seeks (a) a declaration from the Court that the Agency's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) a preliminary and permanent injunction barring the Agency from proceeding with contract performance as presently awarded; (c) an order directing the Agency to take corrective action, including but not limited to reopening the procurement, conducting a reasonable evaluation of Pond's and Tetra Tech's proposals in accordance with the Solicitation's requirements and procurement law; as well as other such relief as the Court deems appropriate.

**PARTIES**

6. Tetra Tech is the high-performing, incumbent contractor for the contract and underlying program at issue in this protest and is a California corporation whose principal address for this procurement is 1634 Eastport Plaza Drive, Collinsville, Illinois 62234.

7. Defendant is the United States of America acting through the Department of the Army, Army Corps of Engineers, Huntsville Engineering and Support Center, a federal agency.

[redacted]

## JURISDICTION & VENUE

8. This Court has jurisdiction over this bid protest under the Tucker Act, 28 U.S.C. § 1491(b)(1), which vests the Court with the authority to "render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" Since Tetra Tech objects to the Army's award of the Contract to Pond as arbitrary and capricious, this case is within this Court's jurisdiction.

9. Similarly, since this bid protest is in connection with the award of a contract by a federal agency, venue is proper in this Court pursuant to 28 U.S.C. § 1491(b).

## STANDING

10. To possess standing under the Tucker Act, a party must demonstrate that it is an interested party and that it was prejudiced by the agency's errors. *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024). An interested party is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (citations omitted); *see also Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed Cir. 2001). Furthermore, "to prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013).

11. As an actual offeror under the Solicitation denied award due to the Army's procurement errors, Tetra Tech has standing to bring this protest as an interested party. Tetra Tech's proposal received an "Outstanding" for Factor 1, Technical and Management Approach;

[redacted]

(*see* Ex. D at 6), which was the most important factor under the Solicitation. (*See* Ex. A-3, Instructions and Evaluation Factors for Solicitation at 10.) As a result, had the Agency not committed errors identified in this Complaint, Tetra Tech had a substantial chance of receiving award of the Contract as the offeror with the highest rated technical proposal, especially since Tetra Tech's price was only one percent (1%) higher than Pond's price. Accordingly, Tetra Tech possesses standing to bring this bid protest as an interested party.

## FACTUAL BACKGROUND

### The Fuels Program

12. The procurement at issue in this case is one of many for services pursuant to Army's Fuels Program, which is a larger continuous effort by the U.S. Government to provide effective fuel systems. (Ex. A-2, Performance of Work Statement at 4.) Specifically, the Fuels Program is "a comprehensive maintenance program that provides vital preventive maintenance and corrective services to the United States Government to sustain a worldwide robust fueling capability in support of federal petroleum facilities and petroleum systems." (*Id.*)

13. Under the Fuels Program, preventive maintenance is "recurring, periodic, or scheduled work to preserve a system or facility by preventing its deterioration, prevent[ing] component failure, prevent[ing] unscheduled outages, and identify[ing] components requiring replacement or repair." (Ex. A-2 at 5.) In contrast, corrective maintenance refers to the "restoration of a real property to such a condition that it may effectively be utilized for its designated purpose by overhaul, re-processing or replacement of constituent parts or materials that

[redacted]

have deteriorated by action or elements or usage and that have not been corrected through maintenance." (*Id.*)

**<u>The Solicitation</u>**

*Overview*

14. On November 17, 2025, the Army issued the Solicitation to procure commercial services for the Fuels Program in support of DLA for the SAD-AF. (Ex. A-1, Solicitation No. W912DY26RA017, at PDF Pg. 10.) Specifically, the work under the Solicitation would be performed for the Air Force in Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, and the outlying areas within SAD which include the Commonwealth of Puerto Rico, and the U.S. Virgin Islands. The Solicitation was amended twice over the course of the procurement. (*See* Ex. A-4, Amendment 02 to Solicitation No. W912DY26RA017.)

15. Due to the nature of the Fuels Program, the Solicitation required that offerors be experienced in "repair, maintenance, and operation of federal petroleum facilities and petroleum systems ensuring those systems are in compliance with codes, criteria, regulations, and laws of the United States." The Solicitation was assigned North American Industry Classification System ("NAICS") Code 561210 (Facility Support Services), however, the Solicitation was not set-aside for small business. (Ex. A-1 at 10.)

16. The Solicitation contemplated a single award of a firm-fixed price ("FFP") stand-alone contract. (*See* Ex. A-4 at 10.) The anticipated period of performance in the Solicitation was for three years, including one 12-month base period and two 12-month option periods. (*Id.*)

[redacted]

Offerors were required to submit all proposal documents through the Procurement Integrated Enterprise Environment ("PIEE"). (Ex. A-3 at 2.)

*The Solicitation's Evaluation Scheme*

17. The Solicitation stated that the Army would make a contract award to the offeror that is considered to provide the "best value" in accordance with the process described in FAR 15.101-1. (Ex. A-3 at 10.)

18. Proposals would be evaluated using the four following factors:

- Technical and Management Approach ("Factor 1")
- Past Performance ("Factor 2")
- Small Business Participation ("Factor 3")
- Price ("Factor 4")

(*Id.*)

19. The Solicitation explained that each factor was listed in "descending order of importance," making the Technical and Management Approach Factor the most important. (*See id.*) Additionally, "[t]he non-price factors (Factors 1, 2, and 3) when combined are significantly more important than price (Factor 4)." (*Id.*) The Solicitation provided the below chart detailing the relative importance of each evaluation factor:

| **Evaluations Factors** | | |
|---|---|---|
| **Factor** | **Description** | **Importance of Factor** |
| Factor 1 | Technical and Management Approach | Most Important |

[redacted]

| | | |
|---|---|---|
| Factor 2 | Past Performance | Less important than Factor 1 More important than Factor 3-4 |
| Factor 3 | Small Business Participation | Less important than Factor 1 and 2 More important than Factor 4 |
| Factor 4 | Price | Least important |

(*Id.*)

20. To receive a contract award, an offeror must receive at least an "Acceptable" rating for Factor 1 (Technical) and for Factor 3 (Small Business Participation). (Ex. A-3 at 10.) Additionally, an offeror needs to also receive at least a "Satisfactory Confidence" or "Neutral Confidence" rating for Factor 2 (Past Performance). (*Id.*) Factor 4 (Price) is not rated but would be evaluated for fairness and reasonableness. (*Id.*)

*Factor 1: Technical and Management Approach*

21. As mentioned above, the Solicitation identified Factor 1 as the most important factor for the best value trade off. (*See* Ex. A-3 at 10.) For Factor 1, the Solicitation required offerors to submit information outlined in Solicitation Attachment 0003 (Technical Evaluation Form), the Service Order Form, and a Mission-Essential Contractor Services Plan. (*Id.* at 5–6.)

22. In its technical proposal, the offeror was required to provide information on:

> [T]he scope of work (including project size, complexity, and any distinctive and/or unique features of the project); project location; contract type (i.e., whether performance-based and whether FFP or CPFF); period of performance; estimated project percent complete, contract dollar value; team members and their roles, the approach to the field work; how the project was managed (i.e., oversight of performance, schedule, cost, quality, and safety); and how challenges were handled (i.e., security, logistics, transportation, disposal requirements, etc.).

[redacted]

(*Id.*)

23. Under Factor 1, the Army would evaluate both the adequacy of the offeror's response and the feasibility of its approach. (*See* Ex. A-3 at 11.) For the adequacy of the response, the Agency would assess "whether the Offeror's methods and approach have adequately and completely considered, defined, and satisfied the requirements specified in the solicitation." (*Id.*)

24. For the feasibility of the approach, the Agency would evaluate "whether the Offeror's method and approach to meeting the solicitation requirements provide the Government with an acceptable level of confidence of successful completion within the required schedule." (Ex. A-3.)

25. Due to the importance of technical capabilities, offerors were required to meet several qualifications. For example, the Performance of Work Statement ("PWS") required that offerors must have over 5 years of demonstrated experience "on federal installations in maintenance and repair of petroleum fuel storage and distribution facilities." (Ex. A-2 at 9.) Because of the importance of an offeror's technical capabilities, the Solicitation stated that the Agency would assess the following in addition to the adequacy and feasibility of a proposal:

- The quality and approach associated with the Contractor's Management Plan.
- The approach to quality management and control.
- The approach to meeting safety requirements and ensuring work is completed in a safe manner.
- The approach to performing the Initial Site Visit and completing the required Equipment Inventory, Facility Maintenance Plan, Essential Mission Plan composition of the proposed maintenance team, response times and the approach to meeting maintenance requirements.
- The approach to performing, documenting, and reporting recurring maintenance.
- The approach to understanding and performing Service Orders at a fair and reasonable price.
- The Technical Evaluation Form will also be evaluated for completeness.

[redacted]

- The approach to developing and using maintenance and repair teams.

(Ex. A-3 at 12.)

26. During its evaluation, the Agency would assign various strengths and weaknesses to each proposal. The Solicitation defined a strength as "an aspect of an offeror's proposal with merit or will exceed specified performance or capability requirements to the advantage of the Government during contract performance." (Ex. A-3 at 13.) In contrast, a "weakness" was defined as "a flaw in the proposal that increases the risk of unsuccessful contract performance." (*Id.*)

27. After conducting its evaluation, the Army would weigh all of the relevant factors and then assign each proposal an adjectival rating for Factor 1. The Solicitation provided the descriptions below for the Factor 1 ratings:

| Color Rating | Adjectival Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal demonstrates an exceptional approach and understanding of the requirements and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength or significant strength, and risk of unsuccessful performance is low to moderate. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high. |

(*Id.* at 12.)

*Factor 2: Past Performance*

28. Factor 2 (Past Performance) was the second most important factor in the Solicitation evaluation scheme. (*See* Ex. A-3 at 10.) For Factor 2, the Solicitation required offerors

[redacted]

to submit a maximum of five (5) past performance projects. (*Id.* at 6.) For each project, the Contractor was required to submit a Contractor Performance Assessment Reporting System ("CPARS") report or a Past Performance Questionnaire ("PPQ"). (*Id.*) The projects were required to be "recent," which the Solicitation defined as being "started or completed within three years" from the closing date of this Solicitation. (*Id.*)

29. Under Factor 2, the Agency would evaluate the "the Offeror's likelihood of success in performing the solicitation's requirements and delivering high quality products and services" based on the past performance projects submitted by the offeror. (Ex. A-3 at 12–13.) The ultimate rating for Factor 2 would be based on the "recency, relevance and quality of products or services" of the offeror's past performance. (*Id.* at 12.)

30. To evaluate Factor 2, the Agency would first review and determine the relevancy of the past performance information. (Ex. A-3 at 13.) As the Solicitation explained, "[m]ore relevant past performance will be treated as a stronger predictor of future success and will therefore have more influence on the overall performance confidence assessment than past performance of lesser relevance." (*Id.*) A relevancy rating would then be assigned based on the following methodology:

[redacted]

| PAST PERFORMANCE RELEVANCY | |
|---|---|
| **Rating** | **Description** |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

(*Id.* at 14.)

31. Following the relevancy rating, the Agency would then assign one of the confidence ratings below based on the recency, relevancy, and quality of the Offeror's past performance:

| PAST PERFORMANCE CONFIDENCE ASSESSMENTS | |
|---|---|
| **Rating** | **Definition** |
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

(Ex. A-3 at 14.)

[redacted]

32. The Solicitation also warned that the Agency may use information obtained from CPARS, including CPARS ratings for projects other than those identified in the proposal. (Ex. A-3 at 14.) The Agency also reserved the right to consider information from other sources in the following areas:

> [D]emonstrated record of successful performance in comparable projects; demonstrated ability to select, retain, support and, when necessary, replace subcontractors; demonstrated implementation of corrective measures that have been implemented to resolve performance issues; demonstrated record of reasonable and cooperative behavior and commitment to customer satisfaction; demonstrated record of cost and schedule management; and the degree of relevancy of all of the considered efforts.

(*Id.* at 15.)

*Factor 3: Small Business Participation*

33. Factor 3 (Small Business Participation) was the third most important factor in the Solicitation evaluation scheme, only more important than price. (*See* Ex. A-3 at 10.)

34. For Factor 3, the Solicitation required offerors to submit a Small Business Participation Plan committing the offeror to use a minimum percentage of small businesses as subcontractors. (Ex. A-3 at 7–8.) The Agency would then evaluate "the level of the Offeror's commitment to Small Business demonstrated in the proposed acquisition and the use of Small Businesses in the performance of prior contracts relevant to the PWS." (*Id.* at 15.) The Agency would then assign each offeror one of the ratings below:

[redacted]

| Color Rating | Adjectival Rating | Descripti on |
|---|---|---|
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the small business objectives. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the small business objectives. |
| Green | Acceptable | Proposal indicates an adequate approach and understanding of small business objectives. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the small business objectives. |
| Red | Unacceptable | Proposal does not meet small business objectives. |

(*Id.* at 16 (error in original).)

*Factor 4: Price*

35. Factor 4 (Price) was the final, and least important, evaluation factor. (Ex. A-3 at 11.) Factor 4 would not receive an adjectival rating and instead would only be evaluated to determine whether it was fair and reasonable. (*See id.* at PDF Page 17.)

36. Each of the Solicitation's CLINs is a firm fixed price CLIN (*See* Ex. A-1 at 3–9.) Relevant to this protest, CLIN 0004 covered the amount that would be paid to the contractor for corrective maintenance and emergency response. (*Id.* at 3–4.) Since it is impossible to know the extent of repairs and corrective maintenance that will be required for SAD-AF2, the Firm-Fixed Price listed for CLIN 0004 was an estimate. (*Id.* at 3.) The contractor would not be entitled to the estimated total Firm-Fixed price and instead CLIN 0004 would be paid through a series of Firm-Fixed Price Service Orders for repairs. (*Id.*) Under this arrangement, the total Firm-Fixed Price for CLIN 0004 operated as a not-to-exceed ("NTE") amount. (*Id.* at 4.)

37. In order for the Agency to effectively evaluate the pricing for reasonableness, offerors were required to complete a pricing worksheet template (the "Pricing Worksheet [redacted]

Template") to calculate a firm-fixed price for the SAD-AF2 requirement. (*Id.* at 8; *see also* Ex. A-5.) For CLIN 0004, the Pricing Worksheet stated in red bold letters "CLIN X0004 – CORRECTIVE MAINTENANCE – DO NOT PRICE" and provided an estimated total not-to-exceed amount of $43,467,254.00 for CLIN 0004 that offerors were required to use to calculate their total proposed firm-fixed price. (*See* Ex. A-5, Solicitation Price Worksheet Template at 1; Ex. B-2, Tetra Tech Pricing Worksheet at 1.)

38. Despite the fixed estimate, offerors were still required to propose the following for CLIN 0004:

| **Binding Service Order Markups** | |
|---|---|
| **Markups** | Value |
| **Profit (%)** | 0.0% |
| **SO Indirect Markup (Supporting Narrative Required) (%)** | 0.0% |
| **Total Service Order Fee (%)** | 0.0% |
| **Emergency Service Order Indirect Rate ($)** | $0.00 |

(Ex. A-5 at 1.)

39. As detailed in the Solicitation's SOW, there were four different types of service orders under the Solicitation: Routine Service Order, Long Lead Service Order, Emergency Service Orders, and Not-to-Exceed Service Orders. (Ex. A-2 at 54.) Relevant to this protest, Emergency Service Orders cover urgent work that is either mission critical, needed to avoid serious impact to life, health, or safety; avoid or mitigate a negative environmental impact; or avoid or mitigate a notice of violation. (*Id.* at 57.)

40. Factor 4 would not receive an adjectival rating and instead would only be evaluated to determine whether it was fair and reasonable. (*See* Ex. A-3 at 17.)

[redacted]

**Evaluation, Award, and Debriefing**

41. Following the second amendment to the Solicitation, proposals were due on December 4, 2025. (*See* Ex. A-4 at 1.) Tetra Tech timely submitted its proposal, along with four other offerors. (*See* Ex. D, Source Selection Decision Document at 6.)

42. Following the Agency's evaluation, it assigned the following ratings:

| Table 4: List of Offerors and Evaluation Findings | | | | | | |
|---|---|---|---|---|---|---|
| **Offeror** | **Small Business (Y/N)** | **Joint Venture (Y/N)** | **Factor 1 Technical and Management Approach** | **Factor 2 Past Performance** | **Factor 3 Small Business Participation** | **Factor 4 Price** |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Pond Constructors, Inc. | N | N | Good | Substantial Confidence | Outstanding | Fair and Reasonable $49,993,840.22 |
| Tetra Tech, Inc. | N | N | Outstanding | Satisfactory Confidence | Outstanding | Fair and Reasonable $50,463,852.84 |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Fair and Reasonable $50,276,935.23 |

(Ex. D at 6.)

43. Relevant to this protest, the Source Selection Evaluation Board ("SSEB") assigned an "Outstanding" rating to Tetra Tech's proposal for Factor 1 based on the following two (2) strengths:

[redacted]

(Ex. C, Source Selection Evaluation Board Report at 8–11.)

[redacted]

44. The SSEB also assigned a "Good" rating to Pond's proposal based on the assignment of the following three (3) strengths and one (1) weakness:

- Strengths:
  - Nine (9) Branch Offices and Expertise
  - [redacted]
- Weakness:
  - Services Order Process

(Ex. C at 8–9.)

45. However, despite the SSEB assigning the Tetra Tech the highest rating for Factor 1–the most important factor–the Contracting Officer serving as the Source Selection Authority ("SSA") found that Pond's proposal represented the best value for the Solicitation. (Ex. D at 11–13.)

46. To reach this conclusion, the SSA first, contrary to the SSEB's results, determined that Pond's proposal was technically superior to Tetra Tech under Factor 1 and provided the following rationale:

> [redacted] The strengths identified in Tetra Tech's proposal are more in line with business decisions that would effectively increase the chances of successful performance, benefiting the company more than the Government while the

[redacted]

> strengths identified in Pond's proposal directly benefit the Government in the form of cost savings and efficiency. Therefore, the SSA has determined that Pond's proposal offers the best value to the Government.
>
> . . .
>
> [redacted]

(Ex. D at 11–13.)

47. In addition to deviating from the SSEB's evaluation, the SSA also found Pond's proposal to represent the best value to the Government because Tetra Tech's proposed Emergency Fee for Service Orders under CLIN 0004 was unreasonably high, making Tetra Tech's proposed price for CLIN 0004, in turn, also unreasonably high. (Ex. D at 12.) Specifically, the SSA found that:

> [redacted]

[redacted]

[redacted]

(*Id.*)

48. Following the determination that Pond's proposal represented the best value to the Army, Pond was selected as the awardee.

49. On March 2, 2026, Tetra Tech received an Unsuccessful Offeror Notice that identified Pond as the awardee. (*See* Ex. E, Unsuccessful Offeror Notice.) Tetra Tech immediately requested a written debriefing and the next day, March 3, 2026, Army sent Tetra Tech a written debriefing. (*See* Ex. F, Agency Debriefing.) Tetra Tech then requested an enhanced debriefing pursuant to Defense Federal Acquisition Regulation Supplement ("DFARS") 215.506-70(a) and submitted additional debriefing questions. (*See* Ex. G, Agency Response to Tetra Tech Enhanced Debriefing Questions.) The Army responded to Tetra Tech's additional debriefing questions on March 9, 2026. (*Id.*)

[redacted]

**Protest at the Government Accountability Office**

50. Following the conclusion of the required debriefing from the Agency, Tetra Tech timely filed a bid protest with the GAO on March 16, 2026. [3] (*See* Ex. I-1, Tetra Tech GAO Protest.)

51. In its initial protest, Tetra Tech challenged that the Army's evaluation of proposal for the Solicitation was unreasonable on two protest grounds: [redacted]; and (2) the Army's unreasonably failed to evaluate the narratives underlying Tetra Tech's Contractor Performance Assessment Report ("CPAR") narratives. (*See* Ex. I-1 at 13–22.)[4]

52. Pond, through counsel, intervened in the GAO Bid Protest on March 18, 2026.

53. The Army filed the Agency Report and the Contracting Officer's Statement of Facts on April 15, 2026. (*See* Ex. I-2, Contracting Officer's Statement of Facts; Ex. I-3, Agency Report Legal Memorandum.)

54. Following a review of the limited documents produced with the Agency Report, such as the SSDD and the SSEB Report, Tetra Tech modified its protest grounds and filed a

---

[3] A separate protest involving the same procurement was also filed with the GAO by Weston Solutions, Inc. ("Weston") on June 22, 2026. *See Weston Solutions, Inc.* , B- 424322.1. (Docket Available online at https://www.gao.gov/docket/b-424322.1.) GAO only combined the Tetra Tech and Weston protests for the purposes of issuing a single decision addressing both bid protests.

[4] In response to reviewing the protected documents in the Agency Report at GAO, Tetra Tech withdrew its argument that the Army's best value tradeoff improperly converted the evaluation to an LPTA. (*See* Ex. I-4 at 3 n.2.)

[redacted]

supplemental protest on April 27, 2026. (*See* Ex. I-4, Tetra Tech Comments and Supplemental Protest.)

55. In its Supplemental Protest, Tetra Tech argued that the Army's best value determination was unreasonable because: (i) it contradicts the facts in the Agency Report, (ii) the SSA failed to consider relevant information, (iii) the determination relied on unstated evaluation criteria, and (iv) the Agency failed to adequately document why it reached its award decision. (Ex. I-4 at 3–13.) Additionally, Tetra Tech also asserted that all three strengths assigned to Pond's proposal were unreasonable, the Agency erroneously found that Tetra Tech's proposed price for CLIN 0004 was unreasonably high, and the Army failed to meaningfully consider Tetra Tech's CPAR narratives when evaluating Tetra Tech's past performance. (*Id.* at 13–33.)[5]

56. The Army then subsequently filed a Supplemental Agency Report with a Supplemental Contracting Officer's Statement of Facts on May 8, 2026. (*See* Ex. I-5, Supplemental Contracting Officer's Statement of Facts; Ex. I-6, Supplemental Agency Report Legal Memorandum.) Tetra Tech timely provided comments on the supplemental agency report on May 15, 2026. (*See* Ex. I-7, Tetra Tech Comments on Supplemental Agency Report.)

57. GAO issued a decision under the protective order in the case on June 18, 2026 denying Tetra Tech's protest, which was followed up with issuing a public version on July 7, 2026. *See Weston Solutions, Inc.; Tetra Tech, Inc*, B-424528.1, *et al.*, (Comp. Gen. June 18, 2026).

---

[5] In order to efficiently address the core issues related to this protest, Tetra Tech does not challenge that the Army arbitrarily failed to evaluate the narratives included in Tetra Tech's CPARs in this protest.

[redacted]

58. However, the GAO decision contains numerous errors of fact and law. For example, the GAO opted not to address Tetra Tech's challenge that Pond's proposal [redacted] did not merit a strength under the terms of the Solicitation. *See Weston*, B-424528.1 at 7–8. Similarly, to rebut Tetra Tech's claim that the best value analysis failed to consider the weakness assigned to Pond's proposal, GAO concluded, without citation, that the record "reflects that the SSA considered the SSEB's entire evaluation, including the weakness assigned to Pond's proposal." *Id.* at 11. Finally, when denying Tetra Tech's multiple challenges to the Army's determination that Pond's proposal was technically superior because the strengths assigned to Pond's proposal "directly benefit the Government in the form of cost savings and efficiency," GAO concluded that "Tetra Tech does not argue that there was any error in the evaluation of strengths or understanding of the strengths." *Id.* However, this statement in the GAO decision is contrary to the fact that Tetra Tech expressly challenged both that the assignment of these strengths and the Army's understanding of these strengths were unreasonable. (*See* Ex. I-4 at 6–9 (challenging Agency's understanding of Pond's strengths), 13–18 (challenging the assignment of Pond's strengths); Ex. I-7 at 2–5 (challenging the Agency's understanding of Pond's strengths), 8–12 (challenging the assignment of Pond's strengths).)

59. Accordingly, this bid protest at the Court follows.

## <u>COUNT I</u>

### <u>The Army's Best Value Determination Arbitrarily Determined that Pond's Proposal was Technically Superior to Tetra Tech</u>

60. Tetra Tech incorporates the allegations in the preceding paragraphs by reference.

[redacted]

61. The Army's best value tradeoff determination was deeply flawed and, as a result, arbitrary. Specifically, the SSA unreasonably disregarded the SSEB's technical evaluation and, instead, found Pond's proposal technically superior notwithstanding its lower technical rating.

62. This Court shall set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004). Additionally, to prevail in a bid protest, the protester must demonstrate that the alleged improper procurement error prejudiced the protester. *See Bannum, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).

63. An agency's decision is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

64. While an agency is afforded considerable deference for its best value tradeoff analysis and determinations, "a procurement decision is without a rational basis or is based upon a clear violation of law, that decision must be set aside." *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed.Cl. 359, 376 (2011); *see also Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 120 (2006) ("Although source selection officials may reasonably disagree with the ratings and recommendations of evaluators, they are nonetheless bound by the fundamental requirement that

[redacted]

their independent judgments be reasonable, consistent with the stated evaluation scheme and adequately documented." (quotation omitted).)

65. As applicable to a best value trade off analysis, FAR 15.308[6] requires that:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

66. The SSA's best value determination in this case failed to meet the requirements of FAR 15.308. Without offering a detailed rationale, the SSA found that Pond's proposal was technically superior on the basis that:

> The strengths identified in Tetra Tech's proposal are more in line with business decisions that would effectively increase the chances of successful performance, benefiting the company more than the Government while the strengths identified in Pond's proposal directly benefit the Government in the form of cost savings and efficiency.

[6] For the sake of clarity, Tetra Tech notes that the provision of the standard version Part 15 of the Federal Acquisition Regulation ("FAR") control for this procurement, not the deviations to the FAR's text in the Revolutionary FAR Overhaul ("RFO") that was adopted by the Department of Defense on February 27, 2026. Under FAR 1.108(d)(1), "FAR changes apply to solicitations issued on or after the effective date of the change" unless the Contracting Officer issues an amendment to adopt the amendment. No such amendment to the Solicitation. Further, the GAO also noted the applicable version of the FAR is the base version, not the RFO. *See Weston*, B-424528.1 at 2 n.2. Accordingly, the RFO version of Part 15 does not apply to this procurement.

[redacted]

(Ex. D at 11.) This determination is arbitrary and capricious. Specifically, the SSA's finding that Pond's proposal was technically superior to Tetra Tech—despite Tetra Tech receiving the highest technical rating—is arbitrary because (i) its stated preference for "cost savings and efficiency" is contrary to the terms of the Solicitation, (ii) the SSA's finding applies unstated evaluation criteria, (iii) the SSA failed to consider the weakness assigned by the SSEB to Pond's technical proposal, and (iv) the Agency failed to adequately document and explain its rationale for the decision in this firm fixed price procurement.

67. Accordingly, the Court should sustain this bid protest ground and should require the Agency to make a new best value tradeoff that is consistent with the terms of the Solicitation and the facts before the Agency.[7]

*The SSA's Reliance on "Cost and Efficiency" over "Increasing the Chances of Successful Performance" to Determine that Pond's Proposal was Technically Superior to Tetra Tech's Proposal is Contrary to the Plain Terms of the Solicitation.*

68. First, and foremost, the SSA's determination that Pond's proposal was technically superior is contrary to the plain terms of the Solicitation.

69. An agency's evaluation of a proposal is arbitrary and capricious if it is contrary to the terms of the solicitation. *See Frawner Corp. v. United States*, 161 Fed. Cl. 420, 447 (2022) (finding an agency's evaluation of an offeror's past performance arbitrary and capricious when it "directly conflicts with the terms of the Solicitation."); *AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 672-74 (2014).

[7] Tetra Tech also challenges that this determination is also flawed because it is based on strengths that were arbitrarily awarded to Pond's proposal, which is explained in detail in Count II.

[redacted]

70. FAR 15.305(a) states that "an agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." As this Court has stated, "[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). This also extends to a requirement for an agency to conduct a best value tradeoff analysis in a manner that is consistent with the terms of the Solicitation. *See FirstLine Transp.*, 100 Fed. Cl. 376–79 (finding that the agency arbitrarily minimized technical differences in a manner contrary to the solicitation's evaluation scheme.)

71. In this procurement, the Solicitation's evaluation scheme emphasized the importance of features in a proposal that increase the chances of successful performance over features that promote cost savings and efficiency. Several sections of the Solicitation expressly reference that the chances of successful contract performance as essential to the evaluation of an offeror's technical capability under Factor 1. For example, in the instructions for submitting the portion of a proposal for Factor 1, the Solicitation states:

> Provided the Offeror does not exceed the overall total page count for the proposal, the Offeror is free to include more information as deemed necessary to communicate the team's technical capability recognizing that a reading of Factor 1 shall demonstrate the areas to be evaluated under this solicitation and leave an evaluator with a complete understanding of all aspects of the team's capability and experience ***to meet the terms and conditions of this solicitation throughout the contract term*** and recognizing that ambiguity or gaps in demonstrated capability may result in a different rating.

(Ex. A-3 at 6 (emphasis added).)

[redacted]

72. The Solicitation also provides the following definitions, all of which expressly reference the importance of an offeror's chances for successful contract performance

- Risk – the potential for unsuccessful contract performance. The consideration of risk assesses the degree to which an offeror's proposal may involve risk of disruption of schedule or degradation of performance, the need for increased Government oversight, and/or the ***likelihood of unsuccessful contract performance***.

- Weakness – a flaw in the proposal that ***increases the risk of unsuccessful contract performance***.

- Deficiency – a material failure of a proposal to meet the Government requirement or a combination of significant weaknesses in a proposal that ***increases the risk of unsuccessful contract performance to an unacceptable level***.

(Ex. A-3 at 11 (emphasis added).)

73. Additionally, the Solicitation states that for Factor 1 the Agency will determine the feasibility of the offeror's approach by evaluating "whether the Offeror's method and approach to meeting the solicitation requirements provide[s] the Government ***with an acceptable level of confidence of successful completion*** within the required schedule." (Ex. A-3 at 11 (emphasis added).)

74. Finally, one of the main differences between an "Outstanding" and a "Good" rating for Factor 1 is that an "Outstanding" rating is warranted when "risk of unsuccessful performance is low, " whereas a "Good" rating is warranted when "risk is low to moderate." (*Id.* at 12.)

[redacted]

75. In stark contrast to the multiple references to contract performance, nothing in the Solicitation's description of the evaluation of Factor 1 discusses valuing "cost savings" or "efficiency." (*See generally* Ex. A-3 at 11–12.)

76. The Solicitation's exclusion of any discussion of "cost savings" or "efficiency" makes sense when one considers the overarching structure of the Solicitation's evaluation scheme. The evaluation of an offeror's technical capabilities to satisfy the Solicitation's requirements under Factor 1 was the most important evaluation factor, whereas price under Factor 4 was the least important (and significantly less important than the three non-price factors). (Ex. A-3 at 10.) Further, this Solicitation is for a firm-fixed price contract, not a cost-reimbursement or time and materials contract.[8] (*See id.* at 10; Ex. A-1 at 3–9.) So, any cost savings to the Agency would only be reflected in an offeror's proposed price, and "cost savings" resulting from efficient contract performance would only benefit the contractor – not the government. *See* FAR 16.202-1 (stating that for a firm-fixed price contract "places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.")

77. Outside the evaluation of price under Factor 4 – the least important evaluation factor – nothing in the plain terms of the Solicitation's evaluation scheme supports favoring a proposal's potential cost savings or the successful performance, especially for the evaluation of an offeror's Technical Approach under Factor 1.

[8] Notably, there is a time and material element to CLIN 0004 through the inclusion of labor hours for services order. (*See* Ex. A-1 at 66.). However, CLIN 0004 is still listed as a Firm-Fixed Price ceiling CLIN that operates as a Not-to-Exceed amount. (*See id.* at 3–4.)

[redacted]

78. Accordingly, the SSA's decision to arbitrarily favor strengths allegedly related cost savings and efficiency in Pond's proposal over strengths related to increasing the odds of successful contract performance in Tetra Tech's proposal was contrary to the plain terms of the Solicitation.

***The SSA's Emphasis on "Cost Savings" and "Efficiency" Constitute Unstated Evaluation Criteria.***

79. Similarly, the SSA's emphasis on "Cost Savings" and "Efficiency" also qualifies as the application of unstated evaluation criteria.

80. In soliciting bids from contractors, "agencies must evaluate proposals and make awards based on the criteria stated in the solicitation" and "may not rely upon undisclosed evaluation criteria in evaluating proposals." *Banknote Corp.*, 56 Fed. Cl. at 386; *see also* FAR 15.305(a). Specifically, "[i]f an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis." *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 614 (2020); *see also Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650–51 (2014) (holding "number of FSS test types" amounted to an unstated evaluation criterion neither stated in the RFQ nor in the Statement of Work Order where bidders were not on notice that factor would become "the predominant differentiator" in selecting awardee.)

81. Here, the SSA relied on criteria that was not included in the Solicitation's evaluation scheme to determine that Pond's proposal was technically superior to Tetra Tech's proposal. Specifically, the SSA found that "the strengths identified in Pond's proposal directly benefit the Government in the form of cost savings and efficiency" whereas the strengths in Tetra

[redacted]

Tech's proposal "are more in line with business decisions that would effectively increase the chances of successful performance, benefiting the company more than the Government[.]" (Ex. D at 11.) Setting aside whether the SSA's conclusion that Tetra Tech's strengths favor Tetra Tech over the Government is reasonable given the Solicitation's emphasis on successful performance, there is no nexus between the Solicitation's requirements for evaluating an offeror's technical proposal and the SSA's decision.

82. First, as explained previously, nothing in the Solicitation's evaluation criteria mentions favoring "cost savings" or "efficiency" beyond an offeror submitting a lower firm fixed price. (*See* Ex. D at 11–12.) Thus, it is evident that the Agency made aspects of a proposal that promote "cost savings" and "efficiency" the predominate differentiator, despite neither being referenced in the Solicitation's technical evaluation scheme. This also renders the SSA's determination irrational. *See Lab'y Corp.*, 116 Fed. Cl. at 650–51.

83. Additionally, while the Agency may consider whether a strength constitutes a benefit to the Government, no portion of the Solicitation states that a strength (or any other portion of an Offeror's proposal) will be disfavored simply because it may also benefit the contractor in addition to the agency. Again, applying evaluation criteria not included in the Solicitation to justify the award to Pond.

84. Accordingly, it is evident that the SSA irrationally applied unstated evaluation criteria when it departed from the SSEB's conclusions and instead found Pond's proposal technically superior to Tetra Tech's proposal.

*The SSA's Determination Finding Pond's Proposal Technically Superior Unreasonable Did Not Consider the Weakness Assigned to Pond's Proposal*

[redacted]

85. The SSA's determination regarding Pond's proposal's technical superiority in the best value analysis also arbitrarily did not consider the weakness assigned to Pond's technical proposal.

86. An agency's decision is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem[.]" *Ala. Aircraft Indus.*, 586 F.3d at 1375.

87. Here, the SSA's tradeoff analysis only states that "Tetra Tech's Strengths, . . . do not outweigh the importance of the strengths identified within Pond's technical proposal," without any discussion of the weakness identified in Pond's technical proposal. (*See* Ex. D at 11–13.) While the SSDD does *mention* that the SSEB assigned a weakness to Pond's proposal related to Pond's understanding of the Service Order Process as part of the summary of the SSEB's findings, that is the only mention of the weakness in the SSDD. (*See id.* at 8.)

88. The omission of the weakness assigned to Pond's proposal is significant in this context. The Solicitation contemplates that Service Orders will be used to order all corrective maintenance services, which is one of the two types of services covered by the Solicitation. (*See* Ex. A-2 at 4, 54–83.) So, understanding the Service Order Process is vital to a contractor's ability, efficiency, and cost-effective performance, meaning that the SSA's decision to ignore this weakness while at the same time finding that certain strengths are a benefit to the Agency due to potential cost savings and efficiency cannot be anything other than arbitrary and capricious. *See Ala. Aircraft Indus.*, 586 F.3d at 1375.

*The Rationale for the SSA's Decision Finding Pond's Proposal Technically Superior Lacks Adequate Explanation and Documentation.*

[redacted]

89. The SSA's determination of Pond's technical superiority as part of its tradeoff analysis is also fundamentally flawed because it contains several generalized conclusory statements that lack adequate explanation.

90. FAR 15.308 requires that "[t]he source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs." To meet this documentation requirement, the source selection decision "must contain more than conclusory and generalized statements." *Standard Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 735 (2013) (citing *Serco Inc. v. United States*, 81 Fed. Cl. 463, 497 (2008) ("Conclusory statements, devoid of any substantive content, have been held to fall short of" the documentation requirement in FAR 15.308)). As the Court of Federal Claims has previously noted "[c]onclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise." *Serco*, 81 Fed. Cl. at 497.

91. Here, this protest should be sustained due to the SSA's failure to document key portions of the best value analysis.

92. First, the SSA does not explain how Tetra Tech's assigned strengths under Factor 1 "benefit[ed] the company more than the Government" because they related to an increased chance in successful contract performance. (*See* Ex. D at 11.) Increased odds of successful contract performance naturally benefits the Government in that it increases the odds of the Government receiving the services it seeks under the procurement. The SSA's statement is simply conclusory and unclear how successful contract performance somehow benefits the contractor

[redacted]

more than the Government. While the SSA does provide a limited assessment of how the listed strengths in Pond's proposal promote efficiency and cost savings, there is no equivalent analysis of Tetra Tech's strengths. (*See id*. at 11–12.)

93. Similarly, the SSA also appears to ignore SSEB comments on Tetra Tech's evaluation that these strengths promote both efficiency and cost savings. In the SSEB Report, Tetra Tech was assigned a strength for both [redacted] (Ex. C at 10-11.) In its evaluation of the strength for Project Manager Self-Performance, the SSEB noted:

> [redacted]

(*Id.* at 10 (emphasis added).)

94. Similarly, for the strength assigned for the [redacted], the SSEB noted:

> [redacted]

[redacted]

(*Id.* at 11 (emphasis added).)

95. While the SSA does provide some detail of the alleged cost savings and increased efficiencies associated with the strengths assigned to Pond's proposal; there is no equivalent assessment of Tetra Tech's strengths – despite the references to increased efficiency and cost saving in the SSEB Report. (*See* Ex. D at 11–12.) Thus, it appears that the SSA either arbitrarily failed to consider that Tetra Tech received praise for its cost savings and efficiency; or the SSA failed to document such consideration. Either way this renders the SSA's determination regarding Pond's proposal's alleged superiority arbitrary and capricious.

*The Agency's Arbitrary Decision Finding that Pond's Proposal Was Technically Superior to Tetra Tech's Proposal Competitively Prejudiced Tetra Tech.*

96. The SSA's arbitrary determination that Pond provided a technically superior proposal competitively prejudiced Tetra Tech. Prejudice exists when "there was a substantial chance that [the plaintiff] would have received the contract award but for [the agency's] error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000).

97. In this protest, absent the Agency's erroneous determination that Pond's proposal was somehow technically superior, Tetra Tech had a substantial chance of receiving award. Factor 1 (Technical and Management Approach) was the most important factor in the Solicitation's evaluation scheme. (*See* Ex. A-3 at 10.) As a result, had the SSA had properly determined that Tetra Tech's proposal should have received the highest rating for the most important factor, there is a substantial chance that Tetra Tech would have received award of the Contract, especially since

[redacted]

Tetra Tech's price was only 1% higher than Pond's price. Thus, the Agency's errors prejudiced Tetra Tech.

**COUNT II**

**The Agency Arbitrarily Assigned Three Strengths to Pond's Proposal.**

98. Tetra Tech incorporates the allegations in the preceding paragraphs by reference.

99. Each of the three strengths assigned by the SSEB to Pond's technical proposal, and affirmed by the SSA, were arbitrarily assigned.

100. As detailed further below, each strength was either the result of an unreasonable reading of Pond's proposal, unequal treatment of offerors, or inconsistent with terms of the Solicitation. Accordingly, the SSEB's assignment of these strengths, and the SSA's reliance on these strengths in their best value analysis, are unreasonable and this protest ground should be sustained. *See BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 694 (2012) (citing *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 767 (2008) (holding that a tradeoff analysis based on significant flawed evaluation ratings is itself irrational).

*The Agency Arbitrarily Assigned a Strength to Pond's Proposal for Noting that it Operates Nine (9) Branch Offices in the Region*

101. The Agency arbitrarily assigned a strength to Pond's proposal under the mistaken belief that Pond was proposing to use employees from nine (9) branch offices in the region covered by the Solicitation. (*See* Ex. C at 8.) However, a review of Pond's proposal demonstrates that this was merely background information on Pond's general operations, not a commitment from Pond to leverage all nine (9) of its offices in the region.

[redacted]

102. The assignment of strength to a proposal may be considered arbitrary when the strength is contrary to the facts that were before the agency. *See Sys. Studies & Simulation, Inc. v. United States*, 152 Fed. Cl. 74, 90-92 (2020) (finding that a strength assigned for "significant cost savings" was arbitrary when the proposal only offered a small amount of cost savings.)

103. Here, the Army arbitrarily credited Pond with proposing to use resources from nine (9) offices, when its actual proposal only identified using resources from four (4) offices.

104. Section 3.0 of the Solicitation's Technical Evaluation Form requires that:

The offeror shall use this section to provide narrative on how the proposed key personnel will be used in the management and execution of both preventive and corrective maintenance to ensure a high-quality standard. (Ex. A-6, Technical Evaluation Form at 2.)

105. Correspondingly, in Section 3.0 of its proposal after detailing its proposed approach to staffing the SAD-AF2 requirement, Pond notes:

106. Pond also has nine (9) branch offices located across [redacted] (Ex. H, Pond Technical Proposal at 5.)

107. After reviewing this language in Pond's proposal, the SSEB assigned a strength under Technical Factor 1 for Pond's nine (9) branch offices and provided the following explanation in the SSEB Report: [redacted]

[redacted]

[redacted].

[RFP Factor I - Technical Evaluation Form, Section 3.0] (Ex. C at 8.)

108. Additionally, in the SSDD, the SSA also states that [redacted] (Ex D at 12.)

109. The SSEB's assignment of this strength arbitrarily rewards Pond for a feature that is not actually in its proposal. It is clear from the contents of Pond's proposal that it is not proposing to leverage all nine (9) offices for the SAD-AF2 requirement and instead is providing general background information on its capabilities. [redacted].

110. Additionally, Pond's proposal stated that it "***also*** has nine (9) branch offices" after discussing its staffing approach, making it clear that Pond generally is located in nine (9) locations throughout the region not that it is dedicating resources from nine (9) different offices.

111. Further, Pond's activities following the award of the Contract also indicate that it was stating that it has nine (9) offices, not that it was committing resources from all nine (9) offices. For instance, Pond has placed job postings for positions related to the SAD-AF2 contract–including postings for key personnel like project managers–indicating that it does not currently

[redacted]

have the personnel to perform the Contract, let alone the personnel to commit resources from nine (9) different offices. (*See* Ex. J, Pond LinkedIn Job Postings for SAD-AF2.)

112. Thus, the Agency's assignment of this strength is unreasonable because the Agency is crediting Pond for the "inclusion" of resources from nine (9) offices, which it did not actually propose in its proposal. Rather than identifying these nine (9) offices as the source of support services, Pond merely provided an additional comment that it also had nine (9) offices in this region.

*The Agency Arbitrarily Assigned a Strength to Pond's Proposal for* [redacted]

113. The Agency also unreasonably assigned a strength to Pond's proposal for [redacted].

114. FAR 1.102-2(c)(3) requires that "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same." As a result, an agency's decision is arbitrary and capricious when it results from unequal treatment of the offerors. *See Thalle Const. Co., Inc. v. United States*, 159 Fed. Cl. 698, 707 (2022); *CliniComp Int'l Inc. v. United States*, 117 Fed. Cl. 722, 742 (2014). To prevail on a claim for disparate treatment a protester must show that its proposal did not receive a strength for an aspect of its proposal that was "substantively indistinguishable" or "nearly identical" to another offeror. *See Office Design Grp. v. United States,* 951 F.3d 1366, 1372 (Fed. Cir. 2020); *SSI Claimsnet, LLC v. United States*, 170 Fed. Cl. 725, 746

[redacted]

(2024) (finding that an agency engaged in disparate treatment when it only assigned a strength to one offeror despite the proposal being substantially indistinguishable).

115. Here it is clear that the Agency arbitrarily engaged in disparate treatment.

116. Section 5b of the Solicitation's Technical Evaluation Form requires that:

> The Offeror shall provide a timeline for your process for performing ISV. Include all functions that will be completed to meet the PWS.

(Ex. A-6, Technical Evaluation Form at 2.)

117. Correspondingly, in Section 5b of its proposal, Pond notes:

> [redacted]

(Ex. H at 7.(emphasis added).)

118. The SSEB awarded Pond a strength for this aspect of Pond's proposal and noted:

> [redacted] [RFP Factor 1 Technical Evaluation Form, Section 5, 5b.]

(Ex. C at 9.)

119. The SSA then provided a further explanation that Pond "[redacted] (Ex. D at 12.)

[redacted]

120. The Agency, however, arbitrarily failed to [redacted]. In Section 5b of proposal, Tetra Tech provided the [redacted]:

[redacted]

(Ex. B-1, Tetra Tech Technical Proposal at 14.)

121. Similar to Pond, Tetra Tech proposed [redacted] (*Compare* Ex. B-1 at 14, *with* Ex. H at 7.)

122. It was incorrect for the Agency to claim that Pond was the "only Offeror" [redacted]. Thus, the Agency engaged in disparate treatment when it arbitrarily assigned this strength to only Pond's proposal when Tetra Tech's proposed a substantively indistinguishable approach. *See SSI Claimsnet,*, 170 Fed. Cl. at 746.

*The Agency Arbitrarily Assigned a Strength to Pond's Proposal for Simply Stating that it will* [redacted]

123. The Agency also unreasonably assigned a strength to Pond's proposal [redacted].

124. In Section 7c of its proposal, Pond stated:

[redacted]

> [redacted].

(Ex. H at 9 (emphasis in original).)

125. In response, the SSEB assigned Pond's reference to [redacted] a strength and explained:

> [redacted] [RFP Factor I -Technical Evaluation Form, Section 7, 7c.]

(Ex. C at 9.)

126. However, this feature of Pond's proposal does not meet the Solicitation's definition of strength and renders the Agency's evaluation unreasonable as a result.

127. The Solicitation states that a "Strength" is warranted when "an aspect of an offeror's proposal has merit or ***will exceed specified performance or capability requirements*** to the advantage of the Government during contract performance." (Ex. A-3 at 11.) The reference to [redacted] in Pond's proposal, however, does not exceed the specified performance or capability requirements. Instead, it simply states that Pond will meet [redacted].

128. Pond's proposal references compliance with [redacted]. (*See* Ex. H at 9.) [redacted] (Ex. A at 29, 31, 58.) Pond also references compliance [redacted]

> [redacted]

[redacted]

129. Every offeror that submitted a proposal is required, by the resulting contract, to provide the same [redacted]. Pond's proposal did not exceed the Solicitation's requirements by proposing [redacted]. Thus, Pond's proposal which met, but did not exceed, the Solicitation's requirement could not constitute a strength under the Solicitation's plain terms, making the Agency's assignment of the strength arbitrary.

130. The Agency's emphasis on Pond's proposed [redacted] also constitutes unstated evaluation criteria. No [redacted] are discussed in the Solicitation beyond [redacted]. Moreover, the Solicitation's Statement of Work ("SOW") does not identify [redacted]. In fact, in Appendix D to the SOW, it states that requirements related to "[redacted]. (*See* Ex. A-2 at 219.) Since there is clearly no nexus between [redacted] and the requirements for work under the Solicitation, the Agency's award of this strength to Pond is the result of the Agency using unstated evaluation criteria. *Lab'y Corp.*, 116 Fed. Cl. at 650–51.

131. Accordingly, the Agency's award of a strength for compliance with the Solicitation's regulatory requirements is unreasonable.

*The Agency's Arbitrary Assignment of Strengths to Pond's Proposal Competitively Prejudiced Tetra Tech*

[redacted]

132. The Agency's flawed assignment of strengths to Pond's technical proposal prejudiced Tetra Tech. Absent the assignment of any one of these strengths, it is unlikely that the SSA would not have determined that Pond's technical proposal was superior to Tetra Tech's proposal.

133. Moreover, without any of the strengths above, the highest rating that the Agency could assign to Pond's proposal would be "Acceptable." (*See* Ex. A-3 at 12 (stating that a "Good" rating for a technical proposal requires "at least one strength or significant strength."))

134. Given that Tetra Tech received the highest rating for the most important factor, there is a substantial chance that Tetra Tech would have received award of the contract if the strengths from Pond's proposal were removed. Accordingly, the Agency's assignment of these three unreasonable strengths prejudiced Tetra Tech.

## COUNT III

## The Agency's Determination that Tetra Tech's Proposed Price for CLIN 0004 was Unreasonably High was Arbitrary and Capricious

135. Tetra Tech incorporates by reference the above-numbered paragraphs as if fully stated herein.

136. The SSA unreasonably found that Tetra Tech proposed an unreasonably high Emergency Services Order Fee ("Emergency Fee") and then used that erroneous finding to justify its best value tradeoff decision. Although Tetra Tech's proposed Emergency Fee was higher than the other offerors, the Agency's determination that Tetra Tech's Emergency Fee was unreasonably high is deeply flawed.

[redacted]

137. Tetra Tech submitted a total firm fixed price of $50,463,853.00, which included the Solicitation's pre-established estimate of $43,467,254.00 for CLIN 0004. (Ex. A-5 at 1.) For the markup of CLIN 0004, Tetra Tech proposed the following:

| **Binding Service Order Markups** | |
|---|---|
| **Markups** | Value |
| **Profit (%)** | [redacted] |
| **SO Indirect Markup (Supporting Narrative Required) (%)** | [redacted] |
| **Total Service Order Fee (%)** | [redacted] |
| **Emergency Service Order Indirect Rate ($)** | [redacted] |

(Ex. B-2, [redacted].)

138. Compared to the other offerors, Tetra Tech's [redacted]. (Ex. C at 63.) However, [redacted]. (*See* Ex. K, Agency Price Comparison at 3.)

139. The SSEB found that both Tetra Tech's total proposed fixed price and its price for CLIN 0004 were fair and reasonable. (Ex. C at 62–64.) However, it made the following remark regarding Tetra Tech's proposed Emergency Fee:

> [redacted]

(*Id.* at 63 (emphasis added).)

[redacted]

140. The SSA concurred with the SSEB finding that Tetra Tech's overall proposed price was fair and reasonable. (*See* Ex. D at 12.) However, in an apparent departure from the SSEB's findings, the SSA found that Tetra Tech's proposed price for CLIN 0004 was unreasonable and cited Tetra Tech's Emergency Fee as an additional justification for why Tetra Tech's proposal did not represent the best value. (*See id.*)

141. Specifically, the SSA stated the following regarding Tetra Tech's Emergency Fee:

[redacted]

(Ex. D at 12 emphasis added).)

142. The SSA's price analysis for CLIN 0004 and its determination that the price for CLIN 0004 is unreasonably high is flawed in several regards.

143. The FAR defines price analysis as "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." FAR 15.404–1(b)(1) (emphasis added). A price reasonableness analysis, which is a type of price analysis, focuses specifically on whether the proposed prices are too high and presents a risk of the government paying a price too high for a contract. *See Serco*, 81 Fed. Cl. at 494 n.48. Here, it is

[redacted]

evident that the Agency arbitrarily hyper-fixated on a single cost element and failed to assess if Tetra Tech's pricing presented any risk to the Agency paying a higher overall price.

144. First, the SSA's determination that Tetra Tech's proposed pricing for CLIN 0004 was unreasonable is irrational because the price for CLIN 0004 was an Agency provided estimate. The Pricing Worksheet Template gave the express instruction of "DO NOT PRICE" for CLIN 0004 and provided an estimate amount offerors were required to use. (*See* Ex. A-5 at 1.) As a result, every offeror, including Tetra Tech, proposed the same mandated total price for CLIN 0004, which was $43,467,254.00. (*See* Ex. K at 1.) Accordingly, it is unreasonable to find that "this CLIN price is unreasonably high" for Tetra Tech's total proposed price for CLIN 0004 since Tetra Tech used the price mandated by the Agency.

145. Additionally, the Agency's fixation on Tetra Tech's proposed Emergency Fee, one of many cost elements for CLIN 0004, was also contrary to law. Under FAR 15.404-1(b)(1), a price analysis — such as a price reasonableness analysis — evaluates a proposed total price "without evaluating its separate cost elements and proposed profit." Thus, since the Emergency Fee is a cost element, not a CLIN, it was inappropriate for the SSA to evaluate the specific price reasonableness of the Emergency Fee under the FAR.

146. Moreover, even if the SSA could assess a cost element like the Emergency Fee for reasonableness, she still erred in failing to assess whether the high cost element imposes a risk that the Agency will pay an unreasonably high overall price for CLIN 0004 and an unreasonably high price overall. The SSA only notes in her best value tradeoff analysis that she finds the Emergency Fee (and by extension CLIN 0004) unreasonably high with no discussion of any risks to the

[redacted]

Agency as a result of an unreasonably high Emergency Fee. (*See* Ex. D at 11–12.) In fact, the word [redacted] does not even appear in the entirety of the SSDD. (*See generally id.*) Thus, it is clear that the Agency has at the very least failed to document any [redacted] related to Tetra Tech's Emergency Fee, rendering its reliance on the Emergency Fee in the best value analysis irrational. *See* FAR 15.308; *Serco*, 81 Fed. Cl. at 497.

147. Importantly, had the Agency actually conducted the required risk assessment then it would have realized that Tetra Tech's Emergency Fee does not have an impact on Tetra Tech's total proposed price. Under the Solicitation, the offeror's total proposed firm-fixed price included an agency fixed-price estimate for CLIN 0004 that was developed independently from Tetra Tech's proposed Emergency Fee. (*See* Ex. A-5 at 1). This established a fixed-price limit for the Government's liability that would not be impacted by Tetra Tech's proposed Emergency Fee or Service Order Fee. While there is a risk that a high Emergency Fee might result in a contractor exceeding the fixed-price limit established by the Agency, that risk is the contractor's risk, not the Agency's. *See* FAR 16.202-1 (stating that a fixed-price contract "places upon contractor maximum risk and full responsibility for all costs and resulting profit or loss"); *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014) (stating that "[t]he essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs."). Thus, it was irrational for the Agency to find that either the Emergency Fee or CLIN 0004 is unreasonably high because neither can result in an increase in the total price the Government will pay.

[redacted]

148. The Agency's emphasis on Tetra Tech's proposed Emergency Fee in the best value tradeoff also constitutes unstated evaluation criteria. The Solicitation only stated that the best value determination would be reached after weighing the non-price factors with the total proposed price. (*See* Ex. A-3 at 10, 16.) Additionally, there is no mention that the pricing of individual cost elements will be weighed against the non-price factors, especially when an offeror's total price is rated as fair and reasonable. Thus, there is a clear lack of a nexus between the Solicitation's stated best value tradeoff analysis and the Agency's consideration of the reasonableness of specific cost elements; therefore, the Agency's focus on Tetra Tech's Emergency Fee to justify its tradeoff analysis is the imposition of unstated evaluation criteria. *See Lab'y Corp.*, 116 Fed. Cl. at 650–51.

149. The Agency's flawed finding that Tetra Tech's Emergency Fee was unreasonably high and the SSA's subsequent reliance of that finding in the best value trade off analysis prejudiced Tetra Tech. But for this error, which was used to justify the SSA's tradeoff decision, Tetra Tech had a substantial chance of receiving the award of the contract as the highest rated offeror for the most important factor. Accordingly, the Agency's assignment of these three unreasonable strengths prejudiced Tetra Tech.

## <u>BASIS FOR INJUNCTIVE RELIEF</u>

150. Tetra Tech incorporates the allegations in the preceding paragraphs by reference.

151. The Court should issue a permanent injunction enjoining performance of the awarded contract and requiring the Army to re-evaluate proposals and make a new award decision in accordance with the Solicitation.

[redacted]

152. Under the Tucker Act, this Court may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

153. The Court must consider the following factors when making a determination for injunctive relief: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest. *See PGBA, LLC v. United States,* 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

154. As discussed above, Tetra Tech's protest succeeds on the merits.

155. Furthermore, absent an injunction, Tetra Tech will be immediately and irreparably harmed by the lost opportunity to receive award under the Solicitation due to the Army's arbitrary and capricious evaluation. *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011).

156. The balance of harms also favors Tetra Tech. The harm to the Army in this instance is minimal insofar as it consists only of re-evaluation of submitted proposals. The harm to Tetra Tech, on the other hand, is the lost award of the Contract based on the Army's arbitrary and capricious procurement decisions. The harm to Tetra Tech is therefore greater and the balance of harms favors Tetra Tech.

157. Finally, the public interest favors the granting of injunctive relief. Government procurements should be administered in a fair and rational process, resulting in award decisions consistent with solicitation requirements and procurement law and regulations. *See, e.g., Bilfinger*

[redacted]

*Berger AG Sede Secondaria Italiana v. United States*, 94 Fed. Cl. 389, 393 (2010). Thus, the public interest favors injunctive relief in this case.

158. Accordingly, an injunction is warranted to remedy the Agency's errors which have prejudiced Tetra Tech.

**PRAYER FOR RELIEF**

WHEREFORE, Tetra Tech respectfully requests that this Court:

i. Declare that the Agency's evaluation of Pond's proposal and Tetra Tech's proposal, and resulting decision not to make award to Tetra Tech, was arbitrary, capricious, unreasonable, and contrary to law.

ii. Issue such preliminary and permanent injunctions as are necessary to prevent the Agency from proceeding with the Contract as currently awarded.

iii. Issue such preliminary and permanent injunctions as are necessary to direct the Agency to re-evaluate the proposals and make a new award determination consistent with the Solicitation and procurement law.

iv. Alternatively, issue tailored relief remanding this matter to the Army to evaluate proposals and make award decisions reasonably and in accordance with the Solicitation and procurement law in light of the Court's decision; and

v. Grant such further relief as the Court deems just and proper, including an award of attorneys' fees and costs.

[redacted]

Dated: July 23, 2026

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

s/Holly A. Roth
Holly A. Roth, Attorney of Record
1650 Tysons Blvd, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8576
Facsimile: (703) 720-8610
E-mail: holly.roth@hklaw.com

*Counsel for Tetra Tech, Inc.*

*Of Counsel:*

John M. McAdams, III
Ben R. Smith
Holland & Knight LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8571 (McAdams)
(703) 720-8584 (Smith)
Facsimile: (703) 720-8610
E-mail: john.mcadams@hklaw.com (McAdams)
ben.smith@hklaw.com (Smith)

Exhibits:
- Ex. A, Solicitation Documents
  - Ex. A-1, Solicitation No. W912DY26RA017
  - Ex. A-2, Performance of Work Statement
  - Ex. A-3, Instructions and Evaluation Factors for Solicitation
  - Ex. A-4, Amendment 02 to Solicitation No. W912DY26RA017
  - Ex. A-5, Solicitation Price Worksheet Template
  - Ex. A-6, Technical Evaluation Form
- Ex. B, Relevant Portions of Tetra Tech's Proposal
  - Ex. B-1, Tetra Tech Technical Proposal
  - Ex. B-2, Tetra Tech Pricing Worksheet
- Ex. C, Source Selection Evaluation Board Report
- Ex. D, Source Selection Decision Document
- Ex. E, Unsuccessful Offeror Notice

[redacted]

[redacted]

[redacted]